UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

| | |
|---|---|
| PATRICK BRENDAN SPILLANE and DEBRA SPILLANE aka DEBORAH SPILLANE,<br><br>       Plaintiffs,<br><br>  -against-<br><br>NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS AND JOINERS OF AMERICA, NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS ANNUITY FUND, NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS PENSION FUND, and NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS WELFARE FUND, JOSEPH A. GEIGER AS TRUSTEE, and EDDIE McWILLIAMS,<br><br>       Defendant. | Civil Action<br><br>21-cv-8016<br><br>ECF CASE<br><br>**COMPLAINT** and **JURY DEMAND** |

-----------------------------------------------------------------------------x

  Plaintiffs PATRICK BRENDAN SPILLANE and DEBRA SPILLANE aka DEBORAH SPILLANE, through their attorneys Erlanger Law Firm PLLC, as and for a Complaint against defendants, allege as follows:

## THE PARTIES

1. Plaintiffs reside in Rockland County, New York.

2. Plaintiffs are husband and wife.

3. Defendant New York City District Council of Carpenters and Joiners of America ("DC") is a United Brotherhood of Carpenters and Joiners of America ("UBC") regional council, consisting of nine individual local unions with more than 20,000 members. DC is an unincorporated association with its principal offices located in New York County, New York.

4. New York City District Council of Carpenters Pension Fund ("Pension Fund")

1

controls and manages an Employment Retirement Income Security Act of 1974 ("ERISA") covered pension plan for the benefit for retired DC carpenters. The Pension Fund is a fiduciary under ERISA.

5. New York City District Council of Carpenters Welfare Fund ("Welfare Fund") controls and manages ERISA covered health insurance plans for the benefit or retired DC carpenters and dependent family members. The Welfare Fund is a fiduciary under ERISA.

6. Defendant Joseph A. Geiger ("Geiger") is DC Trustee and Co-Chair of the Pension Fund and Welfare Fund and DC's Executive Secretary Treasurer (EST).

7. Plaintiff Patrick Spillane ("Spillane") is a retired DC member, and as such, is a participant in DC's Pension Fund and Welfare Fund.

8. Plaintiff Debra Spilllane is a beneficiary of DC's Pension and Welfare Funds.

9. Defendant DC Executive (Area Standards) Director Eddie McWilliams ("McWilliams") is crony of Geiger and DC President and Assistant EST Paul Capurso, who is also a DC Trustee of the Pension Fund and Welfare Fund. McWilliams is DC's chief of organizing, and as such, is a key and powerful figure in DC.

## JURISDICTION

10. This civil action arises under the laws of the United States, specifically under ERISA 29 U.S.C. 1109, 1132(a) & (d). This court has subject matter jurisdiction under 28 U.S.C. §1331.

## COMPLAINT

11. DC's jurisdiction includes collective bargaining agreements (CBA) and project labor agreements (PLA). Article III, section 1 of the 2019 CBA entered into between DC and The

2

Association of Wall-Ceiling & Carpentry Industries of New York ("AWC&C CBA"), expressly gives DC jurisdiction over only: carpenter foremen, carpenter general foremen, journeymen, carpenter, journeymen carpenters, and journeymen carpenter apprentices. Managerial positions as defined by the National Labor Relations Act (NLRA), 29 U.S.C. 152(11), are excluded from DC's jurisdiction.

12. This lawsuit arises from DC deliberately and falsely accusing Spillane of working in "covered employment" under DC's jurisdiction as an hourly foreman for non-union Anfield Interiors, Inc. ("Anfield"). In actuality, Spillane was employed as a salaried project manager, a management position not subject to DC's jurisdiction. And as Anfield's project manager, he never would have or did use his carpenter's tools.

**A.   Background**

13. Spillane was a dues paying carpenter for more than 35 years, beginning in 1984. He retired in 2016 due to physical issues with his knees and shoulders.

14. Spillane had never previously been accused of, fined, suspended, or expelled for violating any union rule.

15. A former co-worker of Spillane's from Eurotech Construction – Ruairi Duffy – formed Anfield, a non-union company.

16. In September 2017, Duffy hired Spillane as an Anfield project manager.

17. As project manager, Spillane did not work with tools, perform any work under a CBA or PLA or supervise any employees working under a CBA or PLA.

18. Spillane worked with employers to manage projects in New York, New Jersey, and Connecticut. He worked predominantly in the office on work permits, payroll and payment

3

requisitions and dealing with architects, engineer, and project supervisors. From time-to-time, Spillane was required to attend on-site meetings with contractors.

19. Spillane received a flat salary and benefits, including health care coverage for himself and Debra Spillane.

**B.    Spillane is Falsely Charged and Found Guilty**

20. The Pension Fund defines "covered employment" as work performed under a CBA or other agreement between DC and a signatory employer. There are seven basic types of covered employment: outside (commercial construction, installation or rehabilitation away from employer's office); shop (production work on employer premises); core drilling (under independent ore drillers or rest boring assoc. agreements); retail maintenance (retail resilient floor agreement); Specialty 1 (in production work on certain retailer premises or other due to contribution rate); Specialty II (NY Times or Lincoln Center or other due to contribution rate); and industrial shop (employer premises with lower contribution rate). Covered employment also includes any employment for which an employer is obligated by agreement to contribute to the Pension Fund; work under reciprocal agreement (work under another pension fund); and NYC employment.

21. Disqualifying employment under the Pension Fund is 40 or more hours of covered employment in any month in New York or New Jersey falling under the DC's trade jurisdiction."

22. The Welfare Fund will terminate benefits if a retiree performs "certain work" while covered under the Fund. Certain work is defined as work for a signatory to a DC CBA or PLA.

23. Disqualifying employment for Retiree Welfare (health benefits) coverage under the Welfare Fund, as of September 2014, was three months of consecutive "certain work"

employment, and effective July 1, 2019, two months of consecutive "certain work" employment.

24. EuroTech is an employer signatory to the AWC&C CBA and working for it is covered employment and certain work.

25. Non-union Anfield is a EuroTech competitor that grew its business very quickly, causing it to come within DC's cross hairs. Among other things, DC posted large inflatable rats and protesting carpenters at Anfield job sites.

26. Without any evidence of any kind, McWilliams just decided that Anfield was a branch of EuroTech, and therefore, was subject to the AWC&C CBA.

27. Among other harassment techniques, McWilliams sought to undermine Anfield by specifically targeting Spillane, who was a key Anfield employee.

28. Then Inspector General (IG) David Pie ("Pie") was a Geiger crony.

29. Upon McWilliams's urging, and upon information and belief armed with nothing more than an ambiguous photo showing Spillane speaking with an unidentified person at a AWC&C covered jobsite, without independent investigation, Pie charged Spillane under the UBC Constitution section 51(A)(12), for "allegedly" violating the UBC Constitution Obligation because he allegedly was working as foreman for a covered employer.

30. First, Anfield is flat out not a covered employer; it is a non-union employer that is not a signatory to any DC CBA or PLA.

31. There is absolutely no direct or indirect ownership connection between EuroTech and Anfield nor does EuroTech, in any way, manage or control or have anything else to do with Anfield's business.

32. Second, even if Anfield had been a covered employer, because Spillane was a

project manager, he was at managerial level and could not have been subject to DC's jurisdiction.

33. After he received notice of McWilliams's/Pie's concocted charges, Spillane appeared on June 13, 2019, the date set for the "First Reading" of the charges. He asked whether amicable settlement was possible, but was told "no." A week later, he received notice of a July 24 trial date before a DC Trial Committee (TC).

34. As Spillane knew he had plans for the trial date, he called DC to ask for an adjournment, which he knew would be routinely granted. He was cut off before the call could be transferred to the proper department.

35. By letter dated July 31, Spillane was notified that: (1) the TC had rendered a "guilty" verdict *in absentia* on July 24 for "violating the Obligation"; (2) he was expelled from DC; and (3) he was levied a $50,000 fine. He received no notice of the so-called evidence that had been submitted against him. Spillane was informed of his right to appeal to UBC within 60 days.

36. Spillane Fedexed his appeal to UBC on September 23. But UBC informed him by letter dated October 2 that his appeal was untimely. DC then notified him by letter dated October 11 that he had been expelled.

C.   **DC is Duplicitous as to Non-Union Work**

37. The UBC Obligation, at the end of the UBC Constitution, requires each member to solemnly promise on his sacred honor that he will use union labor where available and will use all honorable means to procure employment for his brother and sister members.

38. While there is no "de minimis" standard for engaging in non-union activity, which clearly harms DC through loss of business, dues, and pension contributions, DC turns a blind eye

toward carpenters purchasing land and building their *own residences* with non-union labor.

39. DC dishonestly applies a different standard to Geiger cronies and those who are not.

40. Office of the IG investigator, Paul Edwards ("Edwards"), is the most egregious violator of DC non-union work rules. He is a partner in several side non-union construction businesses, including J Squared Builders Inc., and has used considerable paid OIG time working non-union substantial jobs in Orange County, New York

41. DC carpenters, who had engaged in non-union activity, were typically charged with "defrauding the brotherhood" and "violating the Obligation," and upon being found guilty, were summarily expelled from DC.

42. DC member Michael Vecchione was found guilty of *owning and operating a non-union company* and was expelled (2015).

43. DC member Peter Fitzsimmons was found guilty of being *a supervisor* at a non-union contractor and was fined $50,000 and expelled (he appealed)(2018).

44. DC member John McEvoy was found guilty of being *a supervisor* at a non-union contractor and was fined $25,000 and expelled (2019).

45. Other DC members were found guilty of working for non-union contractors and expelled from DC between 2014 and 2018: David Conway (2014), Douglas Griffin (2015), Frank Lamorte (2015), Jason Roy, Jr. (2015), Carlos Garcia (2016), Rui Marques, also fined $15,300 (2017), Patrick Aiello (2018), Maxime Depeault (2018), Jonathan Hache (2018), Frances Paquin (2018), Andrew Delia (2018), Samuel Ahmad (2018), James Neville (2019), and Johnstan Joseph (2019).

46. Many other members were fined, reprimanded, and threatened with expulsion for

doing non-union work.

47. Far worse, Edwards was the only or one of the prosecuting investigators in the Aiello, Fitzsimmons, and McEvoy cases, all of which resulted in expulsion from DC.

48. Edwards bamboozled Pie, into excusing his conduct as "de minimis" and bamboozled Pie's replacement as IG, Richard Greene ("Greene"), into believing that J Squared's substantial non-union work is "allowed" because it is on property he owns.

49. To be clear, among many other provable jobs, J Squared is the general contractor on a large-scale commercial at 310 Stage Road in Monroe. New York, involving construction of six multi-family homes. That non-union work is being done on property allegedly owned by Edwards is irrelevant; it is relevant that Edwards prosecutes other carpenters for being engaged in non-union work while he does so on a commercial scale with impunity.

50. Edwards clearly violated and continues to violate the Obligation.

**D.    Plaintiffs' Loss of Pension Benefits and Health Care Coverage**

    **1.    Loss of Pension Benefits**

51. By letter dated January 17, 2020, Spillane was notified that his pension, in the gross amount of $45,559.07, was suspended effective February 1. based on information received from DC regarding his Anfield employment. The information received from DC was false.

52. Spillane was also notified by the same letter that he had to repay the pension benefits received while engaging in the fictional disqualifying employment.

    **2.    Loss of Health Coverage Benefits**

53. By letter dated January 17, 2020, the Welfare Fund informed Spillane that his and Debra Spillane's health care benefits were permanently terminated because he had received

information from DC that: Spillane is working for Anfield; Anfield is not a Contributing Employer to the Fund; and falsely, that he was supervising and directing carpenters at various construction locations. He was further notified that he is not eligible for continuation of coverage under COBRA and is responsible for reimbursing the cost of health care benefits paid while he was working in disqualifying employment.

54. Spillane did not engage in "certain work" that qualifies as disqualifying employment.

55. Spillane was further forced to repay more than $18,000 in health care benefits that had been previous covered by the Welfare Plan's health coverage.

56. Because his pension and welfare benefits were permanently terminated, Spillane had no choice but to leave his $150,000 a year Anfield job in the hope that his pension and health insurance benefits would be restored.

57. Spillane is not required to exhaust his remedies, among other things, as he was targeted for punishment, a default trial had been held, his time to appeal exhausted, and further denied upon review. McWilliams was determined to cut off plaintiffs' benefits as a way of getting back at his former employer Anfield.

58. Furthermore, the former Pension Fund and Welfare Fund Executive Director chose not to exercise his discretion, instead blindly followed McWilliams's lead and McWilliams had the backing of Trustees Geiger and Capurso.

59. Plaintiffs also face likely irreparable harm by being permanently cut off from health care benefits and pension payments.

# FIRST CLAIM FOR RELIEF
(ERISA Violation)

60. Plaintiffs repeat and reallege each and every allegation of Paragraphs 1 through 59 as if more fully set forth herein.

61. ERISA 502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) provides relief for both statutory and breach of contract violations of member and beneficiary rights.

62. Spillane was an ERISA plan participant for both health care and pension benefits.

63. Debra Spillane was an ERISA plan participant for health care benefits and beneficiary for pension benefits.

64. The Pension Fund and Welfare Fund are ERISA plan fiduciaries.

65. The fiduciaries deprived plaintiffs of benefits arbitrarily and without due process of law.

66. The fiduciaries breached their duty of loyalty to plaintiffs as Fund participants and beneficiaries, and instead, placed DC's interest over theirs.

67. The fiduciaries failed to make decisions independent of conflicting interests, and instead, swallowed DC's position, hook, line, and sinker.

68. The fiduciaries breached the Pension Fund and Welfare's Funds' contractual obligations to plaintiffs.

69. Plaintiffs are entitled to immediate restoration of all benefits, including full pension and health care coverage.

70. Plaintiffs are entitled to disgorgement of all pension benefits withheld.

71. Plaintiffs are entitled to reimbursement of all health care payments that they were

forced to repay.

72. Plaintiffs are entitled to a surcharge from the breaching fiduciaries.

73. Plaintiffs are entitled to an injunction ordering specific performance requiring that the Pension Fund restore Spillane's pension and the Welfare Fund restore Spillane and Debra Spillane's health care coverage.

### SECOND CLAIM FOR RELIEF
(Prima Facie Tort)

74. Plaintiffs repeat and reallege each and every allegation of Paragraphs 1 through 73 as if more fully set forth herein.

75. McWilliams was acting on DC's behalf at all times.

76. McWilliams's conduct that might otherwise would have been lawful – pursuing charges against a DC carpenter retiree – was without justification and intentional and malicious and designed solely to harm Spillane and Anfield.

77. McWilliams's conduct caused plaintiffs special damages.

78. Because of the false charges leveled against him and his being found guilty of the charges *in absentia*, Spillane was forced to resign from his $150,000/year position with Anfield in order to try to recover his wrongfully terminated Pension Fund and Welfare Fund benefits.

79. Spillane lost a 50% match contribution from Anfield against his $400 a week 401K contribution.

80. Plaintiffs have been excluded from carpenter death benefits.

81. Spillane's pension benefits have been wrongfully withheld.

82. Plaintiffs were forced to repay health care benefits paid for by the Welfare Fund.

83. Williams's conduct was a substantial fact in plaintiffs suffering financial loss.

84. As DC's chief organizer, DC is liable for Williams's conduct.

WHEREFORE plaintiffs Patrick Spillane and Debra Spillane demand judgment against defendants for compensatory and punitive damages, reasonable attorneys' fees, costs, and such other and further relief as is deemed just and proper.

Dated: New York, New York
September 27, 2021

**ERLANGER LAW FIRM PLLC**
Attorneys for Plaintiffs

By: s/ Robert K. Erlanger
Robert K. Erlanger (RE-0886)

122 East 42 Street, Suite 620
New York, New York 10168
(212) 686-8045
rke@erlangerlaw.com

## JURY DEMAND

Plaintiffs hereby demand trial of all issues by jury.

Dated: New York, New York
September 27, 2021

By: s/ Robert K. Erlanger
Robert K. Erlanger (RE-0886)